# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

PALOMINO HEATING LLC, individually and on behalf of all those similarly situated,

*Plaintiff*,

v.

ROBERT BOSCH, LLC, ROBERT BOSCH BMGH, BOSCH THERMOTECHNOLOGY CORP., BHC RESIDENTIAL & LIGHT COMMERCIAL LLC f/k/a JC RESIDENTIAL AND LIGHT COMMERCIAL LLC, BOSCH HOME COMFORT LLC f/k/a JOHNSON CONTROLS-HITACHI AIR CONDITIONING NORTH AMERICA LLC, TRANE TECHNOLOGIES PLC, TRANE U.S. INC., MITSUBISHI ELECTRIC TRANE HVAC US, LLC, CARRIER GLOBAL CORP., VIESSMANN MANUFACTURING CO., DAIKIN INDUSTRIES, LTD., DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, INC., DAIKIN APPLIED AMERICAS, INC., THERMALNETICS, LLC, LENNOX INTERNATIONAL, INC., LENNOX INDUSTRIES INC., ALLIED AIR ENTERPRISES LLC, RHEEM MANUFACTURING CO., AAON, INC. (a Nevada corporation), AAON, INC., (an Oklahoma corporation), AAON COIL PRODUCTS, INC., and BASX, INC.,

*Defendants*.

Civil Case No. 2:26-cv-11811

**AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

# CONTENTS

I. INTRODUCTION ....4
II. PARTIES ....7
A. Plaintiff ....7
B. Defendants ....8
1. The Bosch Defendants ....8
2. The Trane Defendants ....10
3. The Carrier Defendants ....11
4. The Daikin Defendants ....12
5. The Lennox Defendants ....14
6. Rheem ....15
7. The AAON Defendants ....16
C. Agents and co-conspirators ....17
III. JURISDICTION AND VENUE ....18
IV. FACTUAL ALLEGATIONS ....19
A. Defendants Take Coordinated Parallel Price Increases ....20
B. AHRI Facilitates Defendants' Conspiracy ....29
C. Defendants Use Pretextual Explanations to Conceal Their Collusion ....31
D. Plus Factors Provide Additional Support for the Existence of Defendants' Conspiracy ....34
1. The HVAC Equipment market is highly concentrated ....34
2. The HVAC Equipment market is subject to high barriers to entry ....35
3. HVAC Equipment are highly fungible commodities ....35
4. HVAC Equipment trade associations and industry events provided ample opportunities for collusion ....36
5. Demand for HVAC Equipment is inelastic ....38
E. Plaintiff and the Class Have Suffered Antitrust Injuries ....39

V. CLASS ALLEGATIONS ........................................................................ 40
VI. TOLLING OF THE STATUTE OF LIMITATIONS .................................. 44
VII. CLAIMS FOR RELIEF ........................................................................ 45
COUNT I: RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ............................................................. 45
COUNT 2: VIOLATION OF STATE ANTITRUST STATUTES ............. 47
COUNT 3: VIOLATION OF STATE CONSUMER PROTECTION STATUTES ........................................................................ 59
COUNT 4: UNJUST ENRICHMENT ........................................................ 68
VIII. DEMAND FOR JUDGMENT ............................................................. 70
IX. JURY DEMAND .................................................................................. 71

Plaintiff Palomino Heating LLC, individually and on behalf of itself and all others similarly situated, brings this action against Defendants Robert Bosch, LLC, Robert Bosch GmbH, Bosch Thermotechnology Corp., BHC Residential & Light Commercial LLC f/k/a JC Residential and Light Commercial LLC, Bosch Home Comfort LLC f/k/a Johnson Controls-Hitachi Air Conditioning North America LLC (together "Bosch"); Trane Technologies plc, Trane U.S. Inc., and Mitsubishi Electric Trane HVAC US (together "Trane"); Carrier Global Corp. and Viessmann Manufacturing Co. (together "Carrier"); Daikin Industries, Ltd., Daikin Comfort Technologies North America, Inc., Daikin Applied Americas, Inc. ("Daikin Applied"), ThermalNetics, LLC (together "Daikin"); Lennox International, Inc., Lennox Industries Inc., and Allied Air Enterprises LLC (together "Lennox"); Rheem Manufacturing Co. ("Rheem"); and AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., and BASX, Inc. (together "AAON"). (collectively, "Defendants") and unnamed co-conspirators and allege as follows:

## I. INTRODUCTION

1. This class action arises from an unlawful conspiracy among the largest manufacturers of heating, ventilation, and air conditioning equipment ("HVAC

Equipment”[1]) in the United States to fix, raise, maintain, and stabilize prices at supracompetitive levels, in violation of federal and state antitrust laws.

2. From at least January 1, 2020, through the present (the “Class Period”), Defendants, who collectively control over 90% of the U.S. HVAC Equipment market, engaged in a coordinated scheme to artificially inflate prices for HVAC Equipment, harming indirect purchasers like Plaintiff and the proposed class. This conspiracy, executed under the guise of responding to global events and inflationary pressures, has resulted in record profits for Defendants while imposing significant financial harm on consumers and businesses across the country.

3. Defendants’ collusion was facilitated through a combination of coordinated price increases, supply restrictions, and the exchange of competitively sensitive information. Beginning in 2020, Defendants announced a series of nearly uninterrupted price increases, often within weeks or months of one another, and justified these increases with pretextual explanations such as the COVID-19 pandemic, supply chain disruptions, and regulatory changes.

4. However, these justifications fail to account for the magnitude and timing of the price increases, which far exceeded historical trends and outpaced

---

[1] “HVAC Equipment” as used in this amended complaint refers to the products used in residential and commercial HVAC systems, including air conditioners, heat pumps, furnaces, boilers, fan coils, evaporator coils, ductless mini-splits, thermostats, ventilation systems, humidifiers and dehumidifiers, and air purifiers.

broader economic indicators such as the Consumer Price Index (CPI). This divergence underscores the artificial nature of Defendants' price inflation.

5. Defendants exploited their dominance and the market's vulnerabilities by leveraging trade associations and industry events to coordinate their anticompetitive conduct. The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"), a trade association dominated by Defendants' executives, played a central role in facilitating the conspiracy by providing a platform for Defendants to exchange confidential data, monitor compliance with the conspiracy, and align their pricing strategies. Defendants also used public announcements in industry publications, such as ACHR News, to signal their price increases and ensure uniformity across the market.

6. In addition to raising prices, Defendants implemented supply restrictions to maintain their inflated pricing levels. For example, Trane and Lennox publicly admitted to reducing production to "manage supply" and "normalize inventory," actions that would ordinarily result in a loss of market share in a competitive market. However, Defendants' conspiracy eliminated this competitive constraint, allowing them to collectively restrict supply without fear of losing customers to rivals.

7. As a result of the conspiracy, Defendants achieved record-high profits and profit margins, boasting about their "pricing discipline" and "positive price

realization" during earnings calls and industry conferences. For instance, Lennox's profit margins nearly doubled from 8% in 2007 to 18% in 2023, while Trane's revenue grew from $12 billion in 2020 to $21 billion in 2025, with a corresponding expansion in its adjusted EBITDA margin.

8. Plaintiff and class members suffered an antitrust injury as a result of Defendants' unlawful conduct by paying illegally inflated prices for HVAC Equipment. Plaintiff brings this action against Defendants for injunctive relief under Section 1 of the Sherman Act, and for damages under various state antitrust, consumer protection, and unjust enrichment laws.

## II. PARTIES

### A. Plaintiff

9. **Plaintiff Palomino Heating LLC** is a New Jersey Limited Liability Corporation that operates an HVAC Equipment installation business. During the Class Period, Plaintiff purchased HVAC Equipment indirectly from one or more Defendants for resale to residential or commercial customers. Plaintiff purchased HVAC Equipment at supracompetitive levels and was injured due to Defendants' anticompetitive conduct, as alleged herein.

## B. Defendants

### 1. The Bosch Defendants

10. **Defendant Robert Bosch GmbH** is a publicly traded corporation incorporated under the laws of Germany. Robert Bosch GmbH's headquarters are in Gerlingen, Baden-Wurttemberg, Germany. Robert Bosch GmbH's United States corporate headquarters are located in Farmington Hills, Michigan.

11. Robert Bosch GmbH manufactures and markets HVAC Equipment for sale in the United States under several different brands and product lines, including Bosch, Buderus, Hitachi, York, Champion, Coleman, Luxaire, TempMaster.

12. Robert Bosch GmbH produces HVAC Equipment such as heat pumps, geothermal water pumps, residential and commercial heat pump systems, commercial packaged rooftop and split units, air handling units, various furnaces, and air purifiers.

13. **Defendant Robert Bosch LLC** is a limited liability company organized under the laws of Delaware with a principal place of business in Farmington Hills, Michigan. Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch GmbH and serves as the corporate headquarters for Robert Bosch GmbH's North American operations.

14. **Defendant Bosch Thermotechnology Corp.** ("Bosch Thermotechnology") is a corporation organized under the laws of Delaware with a

principal place of business in Londonderry, New Hampshire. Bosch Thermotechnology is a wholly-owned subsidiary of Robert Bosch GmbH. Bosch Thermotechnology manufactures and sells HVAC Equipment in the United States under the Bosch and Buderus brands.

15. **Bosch Home Comfort LLC f/k/a Johnson Controls-Hitachi Air Conditioning North America LLC** ("JC-HAC") is a limited liability corporation organized under the laws of Delaware with a principal place of business in Milwaukee, Wisconsin. Bosch Home Comfort LLC is a wholly owned subsidiary of Robert Bosch GmbH. JC-HAC manufactures and sells HVAC Equipment in the United States primarily under the Hitachi brand.

16. **Defendant BHC Residential & Light Commercial LLC f/k/a JC Residential and Light Commercial LLC ("BHC")** is a limited liability corporation organized under the laws of Delaware with a principal place of business in Lansing, Michigan**.** JC is a wholly owned subsidiary of Robert Bosch GmbH and an affiliate of Bosch Thermotechnology Corp. BHC manufactures and sells HVAC Equipment in the United States primarily under the York, Champion, Coleman, Luxaire, and Temp Master brands.

17. Prior to August 2025, JC-HAC and BHC were part of a joint venture between Johnson Controls International plc and Hitachi, Ltd, Johnson Controls-Hitachi Air Conditioning. Robert Bosch GmbH acquired the joint venture, including

JC-HAC and BHC, from Johnson Controls and Hitachi in August 2025 for $8 billion.

18. During the Class Period, each of the Bosch defendants manufactured, marketed, distributed, and sold HVAC Equipment to purchasers throughout the United States.

**2. The Trane Defendants**

19. **Defendant Trane Technologies plc** ("Trane Technologies") is a publicly traded corporation headquartered and incorporated in Dublin, Ireland. Trane Technologies' North American and U.S. headquarters are located in Davidson, North Carolina.

20. In 2008, Ingersoll Rand Inc. acquired Trane Technologies, then known as Trane, Inc., for approximately $10 billion. In March 2020, Ingersoll Rand spun Trane Technologies off into a dedicated climate control company.

21. Trane Technologies operates commercial sales offices for HVAC Equipment in both Flint and Livonia, Michigan and operates an HVAC-Equipment manufacturing operation in Grand Rapids, Michigan.

22. Trane Technologies manufactures and markets HVAC Equipment under several different brands and product lines, including Trane, American Standard, RunTru, Ameristar and Oxbox.

23. **Defendant Trane U.S. Inc.** is a Delaware corporation with its principal place of business in Carrolton, Texas. Trane U.S. Inc. manufactures HVAC Equipment, building management controls, and energy efficient indoor climate solutions for residential and commercial applications. Trane U.S. Inc. is a subsidiary of Trane Technologies.

24. **Defendant Mitsubishi Electric Trane HVAC US LLC** ("Mitsubishi") is a limited liability company organized under the laws of Delaware with a principal place of business in Suwanee, Georgia. Mitsubishi is a 50/50 joint venture formed in 2018 between Trane Technologies and Mitsubishi Electric US, Inc. The joint venture distributes products under the Mitsubishi Electric brand as well as specific Trane and American Standard branded systems.

25. During the Class Period, each of the Trane defendants manufactured, marketed, distributed, and sold HVAC Equipment to purchasers throughout the United States.

### 3. The Carrier Defendants

26. **Defendant Carrier Global Corp.** ("Carrier Global") is a publicly traded Delaware corporation with a principal place of business in Palm Beach Gardens, Florida. Carrier Global manufactures and markets HVAC Equipment under several different brands and product lines, including Carrier, Bryant, Toshiba,

Payne, Tempstar, Airquest, Arcoaire, Beretta, Comfortmaker, Heil, Keeprite, Day & Night, Viessman, and others.

27. **Defendant Viessmann Manufacturing Co. (U.S.), Inc.** ("Viessmann") is a Rhode Island corporation with a principal place of business in Warwick, Rhode Island. Viessmann is a subsidiary of Carrier. Viessman was acquired by Carrier in 2024 through Carrier's acquisition of Viessmann Climate Solutions.

28. Carrier and Viessmann manufactures residential and commercial HVAC Equipment for sale and distribution in the United States, including air conditioners, furnaces, heat pumps, crossover solutions, evaporator coils, geothermal pumps, fan coils, chillers, packaged indoor and outdoor unites, split systems and condensers, and VRF systems though its several aforementioned brand names.

29. During the Class Period, Carrier and Viessman each manufactured, marketed, distributed, and sold HVAC Equipment to purchasers throughout the United States.

**4. The Daikin Defendants**

30. **Defendant Daikin Industries, Ltd.** ("Daikin Industries") is a publicly traded corporation incorporated and headquartered in Osaka, Japan. Daikin's United States corporate headquarters are located in New York, New York.

31. Daikin Industries manufactures and markets HVAC Equipment in the United States, including split/multi-split type air conditioners, unitary (ducted split) systems, air to water heat pump systems, air purifiers, heating systems, packaged air conditioners, medium/low temperature refrigeration, ventilation products, rooftop systems, air cooled chillers, water cooled chillers, airside equipment, and VRV systems, under several different brands and product lines, including Daikin, Amana, Goodman, and others.

32. **Defendant Daikin Comfort Technologies North America, Inc.** ("Daikin Comfort") is a Delaware corporation with a principal place of business in Waller, Texas. Daikin Comfort is a subsidiary of Daikin Industries, The company was known formerly as Goodman Global Group, Inc., until April 2022.

33. Daikin Comfort manufactures, markets and sells HVAC Equipment in the United States primarily under the Goodman Amana, and Quietflex brands.

34. **Defendant Daikin Applied Americas, Inc.** ("Daikin Applied") is a Delaware corporation with a principal place of business in Minneapolis, Minnesota. Daikin Applied is a subsidiary of Daikin Industries and manufactures and markets HVAC Equipment primarily under the Daikin brand.

35. **Defendant ThermalNetics, Inc.** ("ThermalNetics") is a Michigan corporation with a principal place of business in Auburn Hills, Michigan.

ThermalNetics is a subsidiary of Daikin Applied. In 2022, Daikin Applied acquired a majority stake in ThermalNetics.

36. ThermalNetics markets and sells a wide range of HVAC Equipment brands in the United States, including Daikin.

37. During the Class Period, each of the Daikin defendants manufactured and/or marketed, distributed, and sold HVAC Equipment to purchasers throughout the United States.

### 5. The Lennox Defendants

38. **Defendant Lennox International, Inc.** ("Lennox International") is a publicly traded Delaware corporation with a principal place of business in Richardson, Texas.

39. **Defendant Lennox Industries, Inc.** ("Lennox Industries") is a corporation organized under the laws of Delaware with a principal place of business in Richardson, Texas. Lennox Industries is a wholly owned subsidiary of Lennox International.

40. Lennox Industries manufactures and markets HVAC Equipment under the Lennox brand and several other product lines.

41. **Defendant Allied Air Enterprises LLC** ("Allied Air") is a limited liability company organized under the laws of Delaware with a principal place of

business in West Columbia, South Carolina. Allied Air is a wholly owned subsidiary of Lennox Industries.

42. Allied Air manufactures and markets HVAC Equipment under several different brands and product lines, including Allied, Allied Commercial, Armstrong Air, AirEase, Ducane, and Concord.

43. During the Class Period, each of the Lennox defendants manufactured and/or marketed, distributed, and sold HVAC Equipment to purchasers throughout the United States.

### 6. Rheem

44. **Defendant Rheem Manufacturing Co.** (“Rheem”) is a corporation organized under the laws of Delaware with a principal place of business in Atlanta, Georgia. Rheem is a subsidiary of Paloma Industries, Ltd., a privately held company based in Nagoya, Japan.

45. Rheem contracts with HVAC Equipment services in the Detroit, Michigan area.

46. In 2024 Rheem acquired Nortek Global HVAC from Madison Industries.

47. Rheem manufacturers and markets HVAC Equipment for sale in the United States under several different brands and product lines, including Rheem and Rudd, WeatherKing, Sure Comfort, and others.

48. During the Class Period, Rheem manufactured and/or marketed, distributed, and sold HVAC Equipment to purchasers throughout the United States.

### 7. The AAON Defendants

49. **Defendant AAON, Inc.**, a Nevada corporation ("AAON Nevada") is a publicly traded Nevada corporation with a principal place of business in Tulsa, Oklahoma.

50. **Defendant AAON, Inc.** is an Oklahoma corporation ("AAON Oklahoma) with a principal place of business in Tulsa, Oklahoma. AAON Oklahoma is a subsidiary of AAON Nevada.

51. AAON Oklahoma engineers, manufactures, and sells highly configurable HVAC Equipment systems.

52. **Defendant AAON Coil Products, Inc.** ("AAON Coil') is a Texas corporation with a principal place of business in Tulsa, Oklahoma. AAON Coil is a subsidiary of AAON Nevada.

53. AAON Coil Products, Inc. engineers and manufactures semi-custom and custom HVAC Equipment systems, as well as heating and cooling coils for use in HVAC Equipment.

54. **Defendant BASX, Inc.** ("BASX") is an Oregon corporation with principal places of business in Redmond, Oregan and Tulsa, Oklahoma. BASX is a subsidiary of AAON Nevada. BASX, Inc. engineers, manufactures and sells a wide range of custom, high-performance cooling solutions and highly customized air handlers and modular solutions for a variety of markets.

55. AAON manufactures and sells residential, but primarily commercial, HVAC Equipment in the United States, including packaged rooftop units, split systems, air handling units, and condensing units.

56. During the Class Period, each of the AAON Defendants manufactured and sold HVAC Equipment to purchasers in the United States.

**C. Agents and co-conspirators**

57. Air-Conditioning, Heating and Refrigeration Institute ("AHRI") is a non-stock corporation organized under the laws of Virginia with a principal place of business in Arlington, Virginia. AHRI is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America.

58. AHRI's Board of Directors is comprised of, in substantial part, executives of several Defendants.

59. AHRI facilitated the conspiracy as alleged in further detail herein.

60. Unknown persons, firms and corporations not named as defendants also participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy.

61. Defendants are jointly and severally liable for the acts of their co-conspirators, regardless of whether those co-conspirators are named as defendants in this action.

62. Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

63. Each Defendant and co-conspirator acted as the agent or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct that Plaintiff alleges herein.

## III. JURISDICTION AND VENUE

64. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) as this action alleges violations of Sections 1 of the Sherman Act, 15 U.S.C. §§ 1 and 3, that are actionable under section 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 & 26.

65. The Court has personal jurisdiction over each Defendant pursuant to Federal Rule of Civil Procedure 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and allows all process in such cases to be served in any district where the corporation may be found.

66. Defendants transact business in this District, maintain substantial contacts with the United States, including this District, and/or engaged in an antitrust conspiracy directed at persons residing in, located in, and/or doing business in the United States, including in this District, that had the intended effect of causing injury to such persons.

67. Defendants' conduct as described herein was intended to and did have direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District. Defendants sell their products in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

68. Venue is appropriate within this district as Defendants transact business here, and under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. § 1391(b). Further, Defendants and/or their agents may be found in this district.

## IV. FACTUAL ALLEGATIONS

69. Defendants are the leading manufacturers of HVAC Equipment in the United States, having obtained ever-greater shares of the market through years of consolidation. Presently, Defendants represent over 90% of the market for HVAC Equipment in the United States.

70. Plaintiff and Class members are those who purchased HVAC Equipment indirectly for use in their business of reselling and/or installing HVAC Equipment.

71. As such, Plaintiff paid supracompetitive prices for HVAC Equipment as a result of Defendants' conduct as alleged herein.

72. Heating, ventilation and air conditioning ("HVAC") Equipment regulates indoor environments by providing thermal comfort, managing humidity, and improving air quality in residential and commercial buildings.

73. HVAC Equipment functions by heating, cooling, and circulating air—often using furnaces for heat, air conditioners for cooling, and ductwork to distribute air throughout a space. There are several types of HVAC Equipment, including air conditioner condensers, heat pumps, furnaces, air handlers, rooftop units, split systems, chillers, and variable refrigerant flow systems.

74. American homes often require HVAC systems in order to maintain a comfortable and healthy environment.

75. The United States HVAC market was valued at approximately $31.2 billion in 2024 and is projected to grow to $53.8 billion by 2034.

76. HVAC Equipment is produced through a standardized process that results in a commodity product. In the United States, HVAC-Equipment manufacturing is highly regulated by industry standards that have been in place for many years, leading to limited product differentiation. The technology and processes for manufacturing HVAC Equipment are well-established.

77. Demand for HVAC Equipment is relatively stable due to the frequency of its use in residential and commercial properties and the lifecycle of such equipment, which requires periodic maintenance, repair, and replacement.

### A. Defendants Take Coordinated Parallel Price Increases

78. Across 2020, during the turmoil of the COVID-19 pandemic, every Defendant announced price increases. By way of example, on:

i. August 28, 2020, Johnson Controls announced it was "implement[ing] a price increase of up to six percent on residential and commercial heating and cooling products," effective October 1, 2020. Johnson Controls attributed the increase to challenges related to the pandemic and the "escalating frontline manufacturing costs" that resulted;

ii. September 20, 2020, Trane announced a price increase of up to 6% for select commercial "Trane unitary, applied, and controls equipment," effective November 7, 2020;

iii. October 30, 2020, AAON announced a 4% price increase on select commercial HVAC Equipment, effective January 11, 2021;

iv. November 2, 2020, Trane announced price increases of up to 8%. It was reported that "[t]he increase, effective January 1, 2021, applies to Trane, American Standard Heating & Air Conditioning, RunTru by Trane and Ameristar equipment, and all parts and supply brands";

v. November 9, 2020, Lennox announced they would increase prices by 4-6% on all residential and commercial equipment, effective January 18, 2021;

vi. December 9, 2020, Nortek Air Solutions—now part of Rheem—announced a price increase of 3-9% on all its products. The company blamed the increase on "recent rises in labor rates, third-party component vendor prices, and a cost escalation on steel, copper, aluminum, and other commodities"; and

vii. December 21, 2020, Allied Air announced similar price increases of 4-6%, effective February 1, 2021.

79. Into 2021, Defendants continued raising prices, announcing price increases through 2022, including the following:

i. March 8, 2021, Trane announced a price increase of up to 7.5% on its commercial HVAC Equipment, effective April 9, 2021;

ii. March 31, 2021, Trane announced an additional price increase of up to 6% for residential HVAC Equipment, effective April 1, 2021;

iii. April 12, 2021, Lennox announced a 6-9% price increase on all residential and commercial HVAC Equipment, effective June 1, 2021;

iv. April 15, 2021, Daikin announced a 6% price increase on all commercial HVAC Equipment, effective April 26, 2021;

v. April 19, 2021, Lennox subsidiary Allied Air announced a 5-7% price increase, effective June 1, 2021, "[d]ue to inflationary commodity and operational costs";

vi. June 17, 2021, AAON announced it would be raising prices for the third time in under a year, by 5%, effective September 1, 2021. AAON blamed the price increases on "inflationary pressures";

vii. July 2, 2021, Trane announced price increases of up to 7% on select commercial HVAC Equipment, effective August 7, 2021;

viii. July 9, 2021, Trane announced a price increase of up to 7% on select residential HVAC Equipment that shipped on or after August 9, 2021;

ix. July 23, 2021, Lennox announced an 8% price increase on residential and commercial HVAC Equipment "due to further rise in inflationary costs," effective September 1, 2021;

x. September 3, 2021, Daikin announced an 8% price increase on select commercial HVAC Equipment that shipped after January 1, 2022;

xi. September 21, 2021, AAON announced its fourth price increase in the past 12 months. The company implemented another 5% price increase, effective January 1, 2022, again citing "inflationary pressures";

xii. October 26, 2021, Carrier announced price increases of up to 12% on North American commercial HVAC Equipment and up to 10% on residential HVAC Equipment, effective January 10, 2022;

xiii. November 3, 2021, Lennox announced another price increase of up to 13% on residential HVAC Equipment, effective January 1, 2022'

xiv. November 12, 2021, Allied Air announced a comparable price increase of up to 12%, effective January 1, 2022, again citing "persistent inflationary costs";

xv. November 15, 2021, Trane announced similar price increase of up to 12% on residential and commercial HVAC Equipment. Trane's residential price increases were effective January 1, 2022, and its commercial price increases were effective January 15, 2022;

xvi. March 2, 2022, AAON announced another 7% price increase on all HVAC Equipment, effective March 29, 2022, due to further "inflationary pressures";

xvii. March 9, 2022, Carrier announced an up to 9% price increase on residential and commercial HVAC Equipment, effective April 11, 2022;

xviii. March 28, 2022, Lennox announced a similar price increase of up to 9% on residential and commercial HVAC Equipment, effective May 2, 2022;

xix. April 4, 2022, Trane also announced a similar price increase of up to 9% on residential and light commercial HVAC Equipment, effective May 1, 2022;

xx. April 18, 2022, Lennox subsidiary Allied Air announced a price increase of up to 9%, effective June 1, 2022, due to "persistent inflationary costs";

xxi. May 10, 2022, Daikin announced price increases of up to 12% on commercial HVAC Equipment, effective May 25, 2022;

xxii. May 17, 2022, Trane announced a price increase of up to 18% on select commercial HVAC Equipment, effective May 16, 2022;

xxiii. May 26, 2022, Carrier announced a price increase of up to 12% on North American light commercial and commercial HVAC Equipment, effective July 11, 2022;

xxiv. July 29 2022, Daikin announced an increase of up to 5% on commercial HVAC Equipment for all orders beginning on August 31, 2022;

xxv. September 9, 2022, Trane announced a similar, 3-6% price increase on commercial HVAC Equipment, effective September 10, 2022;

xxvi. November 14, 2022, Carrier announced a further price increase of up to 8% on North American commercial HVAC Equipment, effective December 5, 2022;

xxvii. December 5, 2022, Lennox announced it would be increasing residential and commercial HVAC Equipment prices by as much as 8%, effective January 1, 2023.

80. Once Defendants achieved supracompetitive price levels through near-uninterrupted price increases from 2020 through 2022, Defendants sought to maintain these high prices through 2023 and 2024.

81. In July 2023, Lennox's CEO Alok Maskara stated "Regarding price versus inflation, we are pleased to report that the industry pricing remains disciplined and our own mid-year price increase has been broadly successful." Mr. Maskara added that "Our outlook on both components and commodity cost inflation remains stable and unchanged, and we expect the second half of the year to deliver a positive price versus inflation spread."

82. Defendants announced additional price increases through ACHR News, including the following:

i. May 1, 2023, Trane announced another 4-6% price increase on commercial HVAC Equipment, effective May 5, 2023;

ii. August 2, 2023, Trane reported "Strong volume growth, positive price realization and productivity more than offset material and other inflation related to supply chain challenges and higher costs to serve customers";

iii. August 29, 2023, Bosch raised prices on heat pumps, citing "adjustments to market conditions and supply chain challenges";

iv. September 18, 2023, Trane announced 2-6% price increases on commercial HVAC Equipment, effective October 7, 2023;

v. November 14, 2023, Carrier announced an 8% price increase on North American commercial HVAC Equipment, effective the following month;

vi. November 17, 2023, Trane announced price increases of up to 5% on some residential HVAC Equipment, effective January 1, 2024;

vii. December 5, 2023, Lennox's Allied Air subsidiary announced price increases of up to 10% on residential and 12% on commercial HVAC Equipment, effective January 2, 2024;

viii. January 5, 2024, Carrier announced 6-10% price increases on all products, effective March 4, 204;

ix. January 18, 2024, Nortek Global HVAC (Rheem) announced price increases of up to 8% on all residential HVAC Equipment, effective February 26, 2024.

83. In September 2024, Lennox's CFO Michael Quenzer spoke about the shifts that had happened over the prior years in the HVAC Equipment industry, noting "shares don't shift a lot in our industry."

84. Market share stability is a sign of collusion as it suggests that competitors have ceased competing for business on price.

85. Defendants maintained these steady price increases into 2025, further breaking from the trends in other pricing metrics like the CPI.

86. On January 2, 2025, Lennox subsidiary Allied Air raised residential parts and commercial HVAC Equipment prices by 5%, effective January 13, 2025.

87. One month later, on February 1, 2025, Trane announced a 10% increase on residential HVAC Equipment.

88. In April 2025, Rheem announced price increase of approximately 6%.

89. Lennox raised prices by an additional 6% that same month.

90. On September 10, 2025, during the Morgan Stanley Laguna Conference, David Gitlin (Chairman and CEO of Carrier) and Patrick Goris (Senior Vice President and CFO of Carrier) delivered remarks and responded to questions. Mr. Goris stated in response to one question, "What we've seen so far this quarter is

that the combination of the price and the mix up is still double-digit positive. And so that is – obviously that's really good."

91. Trane's CEO Dave Regnery and CFO Chris Kuehn also spoke at the conference, with Mr. Regnery revealing that—in keeping with Lennox's call for discipline—Trane had reduced production to manage supply. Mr. Regnery stated: "We have taken some time out of our factory so that we can balance the inventory load within the channel."

92. During Carrier's earnings call on December 4, 2025, its Chairman and CEO, David Gitlin, made clear that Carrier viewed its prioritization of margin over market share as a model competitors should follow. Mr. Gitlin stated, "And we believe, as market leaders, that we – it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year."

93. December 2025 saw several more parallel price increase announcements. Effective December 31, 2025, Bosch increased prices to its heat pumps and Coleman brand by 6-8%, and Bosch implemented a separate 3% price increase on other HVAC Equipment.

94. During Trane's January 29, 2026 earnings call, Chris Kuhn, Trane's Executive Vice President and CFO, revealed that Trane had "reduced factory production days by one-third," in order "to normalize residential inventory." Kuhn attributed the absence of price decreases to supply remaining short of demand." Kuhn further stated, "We've not seen pricing fade in the business. If I think about the fourth quarter, and pricing, it really is more due to volume being lower than anything else." Kuhn also stated, "I don't want anyone to think that pricing is coming down in that market," assuring Trane's competitors that it would not decrease prices.

95. In a competitive market, a unilateral decision to reduce production would ordinarily result in a loss of market share to competitors who would capitalize on the opportunity to increase their own output and capture additional sales.

Defendants' alleged conspiracy, however, eliminated this competitive constraint. Through their anticompetitive agreement, Trane had assurance that its competitors would not exploit its production restrictions to gain market share, and instead would also restrict supply to maintain record high pricing.

96. Defendants' executives publicly discussed their consistent price increases while attending Barclays Industrial Select Conference held February 17-19, 2026.

97. During a presentation on February 17, in response to a question about price competition in the residential business segment, Lennox CFO Michael Quenzer once again commended the industry for its pricing discipline. Mr. Quenzer announced that Lennox would follow Trane's lead in reducing production to manage supply, stating, "So what we've been trying to do is very disciplined, kind of reduce our inventory levels . . . ." And "[s]o what we're gonna do is reduce some production in the first quarter, keep our inventories flat."

98. Trane's CFO Chris Kuhn presented at the conference as well, announcing, "On price, the team announced a price increase just in the last 10 days. It's up to 5%, effective April 1, and so our plans are to make sure we continue to capture price to offset inflation and still get a spread on that." Mr. Kuhn explained that Trane's price increase was possible because "the industry has been very disciplined in that regard over many years."

99. Two days later, Carrier's Chairman and CEO David Gitlin announced an identical 5% price increase: "If you look at our residential businesses in terms of realization rates, it's probably best as you go from west to east. In the Americas, we have 5% price [increases] that we've announced comes into place next month."

100. On March 2, 2026, Daikin raised certain commercial HVAC Equipment prices by up to 7% and increased other HVAC Equipment prices by 3.5-5%.

101. That same day, Daikin's Amana and Goodman brands both announce price increases of up to 7%, effective of March 16, 2026.

102. Allied Air (Lennox) would subsequently match Daikin's 7% increase.

103. At the same time as prices for HVAC Equipment increased precipitously, Defendants experienced record high profits and profit margins.

104. Throughout the conspiracy, Defendants boasted about rising and record profit margins.

105. For instance, in mid-2024, Morningstar resumed its coverage of Lennox and observed that the company's margins rose "from about 8% during the last sales peak in 2007 to nearly 18% in 2023."

106. Carrier similarly experienced significant profit increases of about 20% from 2020 to 2021 and 2023 to 2024, corresponding closely to the price-increase announcements.

107. In its 2025 Q1 Financial Report, Daikin highlighted how its "[o]perating [p]rofits achieved a new record high" despite inflation and high mortgage interest rates in the Americas.

108. During its earnings call on January 29, 2026, Trane boasted about its profit growth from 2020 to 2025, highlighting that its revenue nearly doubled from approximately $12 billion to $21 billion, representing a compound annual growth rate of approximately 24% over the same period, while Trane's adjusted EBITDA margin expanded by 470 basis points to reach 20% in 2025.

109. AAON similarly experienced substantial profit growth in the wake of multiple price increases and a monthly 1% price increase beginning in June 2022, with AAON reporting in a May 4, 2023 press release: "Gross profit margin in the quarter increased up to 29.0% up to 380 basis points from the comparable quarter in 2022. Price increases implemented over the last year combined with moderating cost inflation were the driving factors to the gross profit margin expansion."

110. The purpose of Defendants' and their co-conspirators' conduct was to raise, fix, stabilize or maintain the price of HVAC Equipment above a competitive level.

111. Although direct purchasers were the first to pay supracompetitive prices, the overcharges were passed along the distribution chain and absorbed by Plaintiff and class members when they purchased HVAC Equipment for their use.

112. Those overcharges, passed down to Plaintiff and class members, caused Plaintiff and class members to suffer injury to their business or property.

113. As a direct and foreseeable result of Defendants' conduct, Plaintiff and class members paid supracompetitive prices for HVAC Equipment during the Class Period.

114. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charges passed through the chain of distribution to indirect purchasers like Plaintiff. Thus, the economic harm to Plaintiff and class members can be quantified.

115. This harm is an antitrust injury of the type that the antitrust laws were designed to punish and prevent.

### B. AHRI Facilitates Defendants' Conspiracy

116. AHRI played a central role in Defendants' conspiracy. As the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration and water heating equipment in North America, it is largely controlled by Defendants and their senior executives.

117. For example, the 2026 AHRI Board includes: (1) Trane's President of HVAC Americas, Holly Paeper; (2) Carrier's President of Climate Solutions Americas, Guarang Pandya; (3) Lennox's CEO, Alok Maskara; (4) Daikin's senior

executive, Yogi Uemura; (5) Rheem's President of Global Air, Mike Branson; and (6) Bosch's Regional President for the Americas, David Budzinski.

118. AHRI has at least two in-person board meetings each year. In 2026, those meetings will be held in Arlington, Virginia in June and Puerto Rico in November.

119. AHRI itself states that it "gather[s] individual company data and distribut[es] it in summaries covering bookings, unit shipments, sales volume, manufacturer inventories, exports, efficiencies, and market information on trading area sales. Information is compiled in various reporting formats and distributed in aggregate form to participants in monthly, quarterly, semi-annual or annual reports."

120. AHRI's "statistical data is not for sale," as AHRI makes the data available through member reports that are shared only to HVAC Equipment companies that provide AHRI (and hence their competitors) with their own confidential data.

121. At the start of the conspiracy, in or around 2020, AHRI launched a new "Analytics App and Executive Dashboard," which AHRI describes as "provid[ing] HVACR[2] industry decision makers with actionable data needed to deliver better business results," through offerings such as "individual and industry product performance data [and] predictive analysis[.]"

122. AHRI has also explained that this program is intended to deliver "real-time program performance data, industry statistics, and the predictive analytics needed to drive results."

---

[2] HVACR refers to Heating, Ventilation, Air Conditions, and Refrigeration. It expands upon HVAC by including refrigeration, i.e. systems used to chill and preserve perishable goods, commonly found in commercial coolers, freezers, and industrial facilities. This action involves only residential and commercial HVAC. It does not include equipment and systems for refrigeration.

123. AHRI also maintains a Standards Policy Committee that "defines the policies and procedures related to development and approval of A[C]HRI standards, guidelines and stand-alone appendices."

124. AHRI's Standards and Policy Committee was chaired by Trane's Darcy Lee in 2024.

125. Voting members of the committee also included Carrier, Lennox, Rheem and Bosch employees.

126. Starting in 2020, Defendants began relying on publicly announced price increases, often through a publication called ACHR News.

127. ACHR News is advertised as the "weekly newsmagazine of the HVACR contractor covering residential and commercial contracting," and its website maintains centralized reporting on the specifics of each price increase announcement. Almost all the price increases that are presented herein were announced through ACHR News.

128. In early February 2020, AHRI held its annual meeting in Orlando, Florida. AHRI's then-Vice Chairman was Mike Schwartz (CEO of Daikin Applied); its then-Board of Directors included Gary Bedard (EVP, President and COO of Worldwide Refrigeration at Lennox), Mike Branson (President at Rheem), Elizabeth Haggerty (VP and GM Global Ducted Systems at Johnson Controls), Chris Nelson (President Residential and Commercial Systems at Carrier), and Donny Simmons (President Commercial HVACR at Ingersoll Rand (Trane's then-parent company)).

### C. Defendants Use Pretextual Explanations to Conceal Their Collusion

129. To cover their rapid price increases, Defendants sought to blame a number of external sources, including the COVID-19 pandemic and the pandemic's resulting cost increases, updated energy efficiency standards, and the phasedown of

hydrofluorocarbons ("HFCs") mandated by the American Innovation and Manufacturing ("AIM") Act of 2020.

130. None of those external sources, however, are sufficient explanations (standing alone or in combination) for the price increases to HVAC Equipment experienced by Plaintiff and the Class.

131. In fact, the Producer Price Index by Industry: Air-Conditioning, Refrigeration, and Forced Air Heating Equipment Manufacturing (the "HVAC PPI"), as shown below, broke from historic trends near the start of the conspiracy, outpacing increases in the Consumer Price Index ("CPI"), which reflects the average change over time in the prices paid by consumers for an assortment of consumer goods and services.




132. HVAC PPI also outpaced increases in the Producer Price Index by Industry: Major Household Appliance Manufacturing ("Household Appliance PPI"), as shown below, which reflects prices paid by consumers for an assortment of home appliances and equipment and more closely tracked CPI.




133. Efforts to improve energy conservation standards also fail to explain price increases, as Defendants had at least six years to development compliant HVAC Equipment.

134. In fact, the HVAC Equipment industry itself led domestic efforts to phase out HFCs, investing billions in the transition and beginning their advocacy over 20 years before the restrictions took effect in 2025.

135. Prior to Defendants' conspiracy, HVAC Equipment generally experienced stable and small prices increases, as can be seen the graphs above, which is consistent with both what one would expect in a normal market and with general consumer price trends.

136. In early 2019, some HVAC Equipment companies sought to implement price increases, but these were isolated and not sustained. As an example, when Nortek Air (now a part of Rheem) announced a 6% price increase on February 13, 2019, other companies did not follow with a similar price increase.

137. But that changed in 2020 when Defendants began to exchange pricing information and competitively sensitive information with the purpose of coordinating supracompetitive prices for HVAC Equipment and generating historic profit margins.

## D. Plus Factors Provide Additional Support for the Existence of Defendants' Conspiracy

138. The HVAC Equipment industry bears many of the characteristics of a highly cartelized market: (1) producer concentration; (2) high barriers to entry; (3) commodity product; (4) inelastic demand; (5) opportunities to collude; and (6) the absence of close substitutes. These characteristics support Defendants' collusion to raise and fix the prices of HVAC Equipment.

### 1. The HVAC Equipment market is highly concentrated

139. Defendants control approximately 90% of the HVAC Equipment market. This makes collusion easier because there is little outside competition to undermine Defendants' conspiracy and permits Defendants to monitor each other's pricing and supply actions more easily.

140. That high market concentration is the result of recent consolidation in the HVAC Equipment industry. As examples, Carrier announced the acquisition of heat pump manufacturer Viessmann Climate Solutions in April 2023, and which Carrier completed in January 2024; Rheem completed its acquisition of Nortek Global HVAC in October 2024, giving it control of the Frigidaire, Maytag, Miller, Broan, Gibson, Intertherm, and Partner's Choice brand lines; and Bosch acquired Johnson Control's residential and light commercial HVAC business for $8.1 billion, in August 2025.

141. In highly concentrated markets, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that producers might have achieved by undercutting the cartel price.

### 2. The HVAC Equipment market is subject to high barriers to entry

142. The costs to enter the HVAC Equipment market are also indicative of collusion. Those costs keep potential new entrants out of the market. For example, Daikin's Texas Technology Park cost $417 million to build, took over two years to complete and employs approximately 5,000 people.

143. In addition to the capital expenditure necessary to open a new plant, new entrants must also overcome brand loyalty and strong name recognition of established brands, some of which have histories of over 100 years.

144. Those barriers make it easier for incumbents, like Defendants, to collude.

### 3. HVAC Equipment are highly fungible commodities

145. HVAC Equipment are fungible commodity products with little differentiation, with one supplier's type readily substituted for another supplier.

146. Pricing of residential and commercial HVAC Equipment is generally consistent across Defendants' brands, ranging from $2,000 to $15,000 in the residential HVAC Equipment market, to between $5,000 and over $100,000 in the commercial HVAC Equipment market. Variations in residential and commercial HVAC Equipment prices are due to the complexity of the system being installed, efficiency ratings, speed varieties, size/capacity, noise-reduction, and other factors. Additional factors related to installation, including labor costs, building size and duct-work, contribute to the variability of overall consumer cost.

147. Such a market is susceptible to collusion, as price is the primary differentiating factor in the HVAC Equipment market, and cartel members can more easily monitor compliance and detect defectors.

#### 4. HVAC Equipment trade associations and industry events provided ample opportunities for collusion

148. Defendants also took advantage of opportunities to collude through industry associations like AHRI, forums and regularly attended industry events.

149. Trane, Lennox, Carrier, Rheem, Daikin, AAON, and Bosch are members of AHRI.

150. AHRI hosts several events each year, including what it refers to as four premiere events.

151. Defendants' senior executives currently hold and have leadership roles on the AHRI Board of Directors. Leadership roles were also held throughout the Class Period.

a. In 2026, Mike Branson (President of Global Air Division, Rheem) serves as Chairman and Holly Paeper (President of Commercial HVAC, Trane) serves as Vice Chairman. David Budzinski (Deputy CEO and President Americas, Bosch), Alok Maskara (CEO, Lennox), Guarang Pandya (President of Climate Solutions Americas, Carrier), and Yogi Uemrua (President, Daikin) all serve on the Board of Directors.

b. In 2025, Mike Branson served as Vice Chairman and David Budzinski, Gaurang Pandya, Holly Paeper, and Yogi Uemura served on the Board of Directors.

c. In 2024, Gary Bedard (Executive Vice President and President of Residential, Lennox) served as Chairman.

152. From January 31, though February 2, 2022, executives from Carrier, Trane, LG, Daikin, Rheem, and Mitsubishi were all present at the AHRI Expo in Las Vegas. And during March 28-30, 2022, executives from Carrier, Goodman Manufacturing (Daikin), Johnson Controls, and Rheem would all meet at the ACCA Annual Conference and Expo in St. Louis.

153. In 2023, the ACRHI Expo was held on February 2-6 in Atlanta, Georgia, where executives from Daikin, Johnson Controls, and Rheem were in attendance.

154. On April 2-5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo in New Orleans, Louisiana. There, Braden Cook (Carrier), Nathan Walker (Daikin), Brandon Franks (Johnson Controls), and Randy Roberts (Rheem) participated in a panel discussion about the state of the HVAC Equipment industry.

155. The 2025 AHRI Expo was held in Orlando, Florida and was attended by executives from Daikin, Johnson Controls, LG, Mitsubishi, and Rheem.

156. The 2025 ACCA Annual Conference and Expo was held March 23-27 in Austin, Texas and was attended by executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem.

157. Heating, Air-conditioning, and Refrigeration Distributors International ("HARDI") is another organization through which Defendants had numerous opportunities to collude.

158. HARDI holds itself out as the leading professional trade association for HVACR wholesale distributors, manufacturers, and representatives and "serves its members through government affairs and advocacy efforts, market intelligence and benchmarking, training programs, and world class events."

159. In 2025, at the HARDI Annual Conference, a "Supplier Town Hall" was held, "dedicated to Supplier Manufacturers!"

160. During that same conference, a roundtable discussion was held for "Manufacturer Reps Only."

161. During the Class Period, HARDI's annual conferences featured speakers from Defendants and was sponsored by Defendants.

162. Additional opportunities to collude arose at the Morgan Stanley Laguna Conference and the Barclays Industrial Select Conference.

163. The Morgan Stanley Laguna Conference was held September 10-12, 2025, and was attended by the executives of Carrier, Trane, and Lenox. There, Carrier's Senior Vice President and CFO brushed aside the concept of price competition; Lennox's CFO commended the industry's price discipline and discuss Lennox's forthcoming price increases; and Trane's CEO talked about Trane's efforts to reduce supply.

164. The Barclays Industrial Select Conference was held February 17-19, 2026, and was attended by executives from Lennox and Trane.

165. There, Lennox's CFO spoke of the industry's discipline and mentioned price increases. Trane's CFO announced a 5% price increase, which Carrier matched two days later.

**5. Demand for HVAC Equipment is inelastic**

166. When HVAC Equipment fails, owners rarely delay purchasing replacement equipment because of its necessity to temperature regulation, comfort, indoor air quality, and safety.

167. There are no significant substitutes for HVAC Equipment. As Lennox's CFO Micharl Quenzer realized, "It's not like there's a great substitute for HVAC unless people don't want to have heating and air conditioning."

168. Per the U.S. Census Bureau's Survey of Construction, 95.4% of new single-family homes started in 2020 in the United States had central air conditioning.

169. The U.S. Energy Information Administration's 2020 Residential Energy Consumption Survey indicates that two-thirds of all homes in the United States have central air conditioning.

170. Data from the same survey indicates that almost three-quarters of homes have central heating.

171. For commercial buildings, a 2023 article from the U.S. Energy Information Administration states that 83% of commercial buildings had space heating in 2018, with 78% having space cooling.

## E. Plaintiff and the Class Have Suffered Antitrust Injuries

172. Defendants' anticompetitive conduct has had the following effects, among others:

i. Price competition has been restrained or eliminated with respect to HVAC Equipment;

ii. The prices of HVAC Equipment have been fixed, raised, stabilized, or maintained at artificially inflated levels;

iii. Indirect purchasers of HVAC Equipment, including Plaintiff, paid artificially inflated prices.

173. The ultimate purpose of Defendants' conduct is to raise, fix, maintain, or stabilize the price of HVAC Equipment and, as a direct and foreseeable result, Plaintiff and the Class have paid supra-competitive prices for the HVAC Equipment during the Class Period.

174. Because of the antitrust violations alleged herein, Plaintiff and Class Members have sustained injury, having paid higher prices for the HVAC Equipment

than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

## V. CLASS ALLEGATIONS

175. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a) and (b)(2), seeking injunctive relief on behalf of itself and a class of Commercial Indirect Purchasers defined as follows (the "Nationwide Class"):

> All persons and entities in the United States and its territories that purchased HVAC Equipment indirectly from Defendants from January 1, 2020, until the present for the purpose of resale.

176. Plaintiff also brings this action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) seeking damages and equitable relief under state law on behalf of itself and a class of Commercial Indirect Purchasers defined as follows (the "Commercial State Law Damages Class"):

> All persons and entities in the Indirect Purchaser States and Territories[3] that indirectly purchased HVAC Equipment from Defendants from January 1, 2020, until the present for the purpose of resale.

[3] The Indirect Purchaser States and Territories are: Alabama, Arizona, California, Colorado, Connecticut, District of Columbia, Florida,, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

177. Excluded from the classes are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents, all state and federal governmental agencies, and any judges or justices assigned to hear any aspect of this action.

178. **Numerosity.** The Classes are so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members. However, given the ubiquity of HVAC systems in both residential and commercial buildings across the United States, Plaintiff believes that due to the nature of the HVAC Equipment industry, there are at least hundreds of thousands of members of the Classes in the United States.

179. **Typicality.** Plaintiff's claims are typical of the claims of the Class in that it and class members purchased HVAC Equipment indirectly from one or more Defendants at artificially inflated prices. Plaintiff and all Class members were damaged by the same common course of wrongful conduct.

180. **Commonality.** Questions of law and fact that arise from Defendants' anticompetitive conduct are common to the Class, including, but not limited to the following:

i. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of HVAC Equipment sold in the United States in violation of federal antitrust laws;

ii. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of HVAC Equipment sold in the United States in violation of the antitrust, unfair competition, and consumer protection laws of various states and territories;

iii. The identity of the participants of the alleged conspiracy;

iv. The scope and duration of the alleged conspiracy;

v. The effect of Defendants' alleged conspiracy on the prices of HVAC Equipment sold in the United States during the Class Period;

vi. Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and other members of the classes;

vii. Whether the conduct of Defendants and their co-conspirators caused Plaintiff and other members of the classes to suffer damages in the form of overcharges on HVAC Equipment indirectly purchased from Defendants or their co-conspirators;

viii. Whether Plaintiff and other members of the classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

ix. Whether Defendants unjustly enriched themselves to the detriment of Plaintiff and members of the classes, thereby entitling Plaintiff and members of the classes to disgorgement of all benefits derived by Defendants;

x. The appropriate class-wide measure of damages; and

xi. Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

181. **Predominance**. The above common questions of law or fact predominate over any questions affecting only individual class members.

182. **Adequacy.** Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests coincide with, and are not antagonistic to, the interests of the Class members. Further, Plaintiff has retained competent counsel experienced in antitrust class action and other complex litigation.

183. **Superiority.** Class action treatment is the superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this action as a class action.

184. Plaintiff knows of no special difficulty that would be encountered in this action that would preclude its maintenance as a class action.

185. Defendants' wrongful actions are generally applicable to the class members as a whole for which Plaintiff seeks, *inter alia*, damages and equitable remedies.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

186. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff has as a result of the unlawful conspiracy alleged in this Amended Complaint.

187. Further, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued to make sales of HVAC Equipment whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and industry data exchange agreements.

188. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class Members.

189. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class Members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier

times. This means that each illegally priced sale of HVAC Equipment by a Defendant constituted a new cause of action for purposes of the statute of limitations.

## VII. CLAIMS FOR RELIEF

### COUNT I: RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (Against All Defendants)

190. Plaintiff repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

191. At least as early as January 1, 2020, and continuing through the present, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for HVAC Equipment in the United States to supra-competitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

192. Defendants have contracted, combined, and conspired to raise, fix, maintain, and/or stabilize the prices of HVAC Equipment sold indirectly to purchasers in the United States.

193. Defendants have shared competitively sensitive confidential information that enable coordinated non-competitive conduct on pricing and output.

194. Because Defendants are direct competitors in the HVAC Equipment market, this conduct is *per se* unlawful under the Sherman Act.

195. Defendants' conduct is also unlawful under a rule of reason or quick look analysis because Defendants' agreement is anticompetitive with no valid procompetitive justification. Even if valid procompetitive justifications existed, such justifications could have been reasonably achieved through less restrictive means of competition.

196. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

i. Price competition in the sale of HVAC Equipment has been restrained, suppressed, and /or eliminated in the United States;

ii. Prices for HVAC Equipment sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

iii. Those who purchased HVAC Equipment from Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

197. Plaintiff and Class Members have been injured and will continue to be injured by paying artificially inflated prices for HVAC Equipment purchased indirectly from Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

## COUNT 2: VIOLATION OF STATE ANTITRUST STATUTES

## (Against all Defendants)

198. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

199. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy as to the sale of HVAC Equipment in an unreasonable restraint of trade and commerce in violation of the various state statutes set forth below.

200. The contract, combination or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain supracompetitive prices for HVAC Equipment in the United States and its territories.

201. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including (a) agreeing to fix, increase, inflate, maintain, or stabilize prices of HVAC Equipment purchased by Plaintiff and members of the Damages Class; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

202. Defendants and their co-conspirators engaged in the actions described herein for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of HVAC Equipment.

203. As a direct and proximate result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for HVAC Equipment than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the following jurisdictions were designed to prevent and flows from that which makes Defendants' conduct unlawful.

204. Defendants' anticompetitive acts described herein were knowing, willful and constitute violations of the following state antitrust statutes:

205. **Alabama**: Defendants have entered into an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 et seq. Defendants' unlawful conduct caused (1) competition for HVAC Equipment was restrained, suppressed, and eliminated within Alabama; (2) HVAC Equipment prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Alabama have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Alabama commerce and caused Class members in Alabama to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and members of the Damages Class in Alabama seek all forms of relief available under ALA. CODE § 6-5-60, et seq.;

206. **Arizona**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq. Defendants' conspiracies had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Arizona; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.;

207. **California**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for HVAC Equipment has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for HVAC Equipment provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased HVAC Equipment indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a);

208. **Colorado**: Defendants have entered into an unlawful agreement in restraint of trade in violation of COLO. REV. STAT. §6-4-101 et seq. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Colorado; (2) HVAC Equipment prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Colorado commerce and caused Class members in Colorado

to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Damages Class members in Colorado seek all forms of relief available under COLO. REV. STAT. §6-4- 101, et seq.;

209. **Connecticut**: Defendants have entered into an unlawful agreement in restraint of trade in violation of CONN. GEN. STAT. §35-24 et seq. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Connecticut, and (2) HVAC Equipment prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Connecticut commerce and caused Class members in Connecticut to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Damages Class members in Connecticut seek all forms of relief available under Conn. Gen. Stat. §35-24 et seq.;

210. **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. CODE §28-4501, et seq. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the District of Columbia; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiff and members of the Class, including those who resided in the District of Columbia and Purchased HVAC Equipment in the District of Columbia, paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful conduct substantially affected the District of Columbia's commerce and caused Class members in the District of Columbia to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Damages

Class members in the District of Columbia seek all forms of relief available under D.C. CODE §28-4501, et seq.;

211. **Illinois**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, et seq. The Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Illinois; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. Because of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, et seq.;

212. **Iowa**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Iowa; (2) HVAC Equipment prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. Because of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code § 553.1, et seq.;

213. **Kansas**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. § 50-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Kansas; (2)

HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. § 50-101, *et seq*.;

214. **Louisiana**. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Louisiana Monopolies Act ("LMA"), La.R.S. 51:121, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Louisiana; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Louisiana. During the Class Period, Defendants' illegal conduct substantially affected Louisiana commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under the LMA;

215. **Maine**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Maine; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104;

216. **Maryland**: Defendants have entered into an unlawful agreement in restraint of trade in violation of MD. CODE ANN., COM. LAW §11-201 et seq. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout the State of Maryland; and (2) HVAC Equipment prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period,

Defendants' unlawful conduct substantially affected Maryland commerce and caused Class members in Maryland to pay supracompetitive prices for HVAC Equipment. Accordingly, Plaintiff and Class members in Maryland seek all forms of relief available under MD. CODE ANN., COM. LAW §11-201 et seq.;

217. **Michigan**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Michigan; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws § 445.771, et seq.;

218. **Minnesota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. § 325D.49, et seq.;

219. **Mississippi**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code § 75-21-1, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially

high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code § 75-21-1, et seq.;

220. **Nebraska**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. § 59-801, et seq.;

221. **Nevada**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Nevada; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, et seq.;

222. **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) HVAC Equipment prices were raised, fixed, maintained, and

stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.;

223. **New Jersey:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Jersey Statutes Annotated § 56:9-3, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under the New Jersey Statutes Annotated § 56:9-3, et seq.;

224. **New Mexico**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, et seq.;

225. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout New York; (2) HVAC Equipment prices were raised, fixed, maintained, and

stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, et seq.;

226. **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, et seq.;

227. **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code § 51-08.1-01, et seq.;

228. **Oregon**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed and eliminated throughout Oregon; (2)

HVAC Equipment prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, et seq.;

229. **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, et seq. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, et seq.;

230. **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, et seq.;

231. **Tennessee**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Tennessee; (2)

HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. § 47-25-101, et seq.;

232. **Utah**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Utah; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.;

233. **Vermont**: Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vt. Stat. Ann. § 2453, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Vermont; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 Vt. Stat. Ann. § 2465, et seq.;

234. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout West Virginia;

(2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, et seq.; and

235. **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. § 133.01, et seq. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. § 133.01, et seq.

## COUNT 3: VIOLATION OF STATE CONSUMER PROTECTION STATUTES

## (Against All Defendants)

269. Plaintiff incorporates and realleges, each allegation set forth in the preceding paragraphs, as though fully set forth herein.

270. During the Class Period, Defendants engaged in unfair competition or unfair, or unconscionable acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

271. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members were injured and are threatened with further injury.

272. Defendants' anticompetitive acts, described herein, constitute violations of the following state consumer protection laws:

273. **California**: Defendants have engaged in unfair competition, unfair and unlawful acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*. Defendants' unfair and unlawful conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout California; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful and unfair conduct substantially impacted commerce in California. Accordingly, Plaintiff and Class members seek all forms of available relief under this statute.

274. **Florida**: Defendants have engaged in unfair trade, unfair, or unconscionable acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Florida; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Florida; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful and unconscionable conduct substantially impacted commerce in Florida. Accordingly, Plaintiff and Class members seek all forms of available relief under Fla. Stat. §§ 501.201, *et seq*.

275. **Illinois**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Illinois; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Illinois. Accordingly, Plaintiff and Class members seek all forms of available relief under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*.

276. **Massachusetts**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A, §1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Massachusetts; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Massachusetts. Accordingly, Plaintiff and Class members seek all forms of available relief under Mass. Gen. Laws Ann. Ch. 93A, §1, et seq.

277. **Minnesota**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Minnesota Consumer Protection Act, Minn. Stat. § 325F.69, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Minnesota; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Class were

deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Minnesota. Accordingly, Plaintiff and Class members seek all forms of available relief under Minn. Stat. § 325F.69, *et seq*.

278. **Nebraska**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Nebraska; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Nebraska. Accordingly, Plaintiff and Class members seek all forms of available relief under Neb. Rev. Stat. § 59-1601, *et seq*.

279. **Nevada**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the Nevada Deceptive Trade Practices Act. Nev. Stat. § 598.0923, *et seq*. Defendants' conduct has had the

following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Nevada; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Nevada. Accordingly, Plaintiff and Class members seek all forms of available relief under Nev. Stat. § 598.0923, *et seq***.**

280. **New Jersey:** Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1 *et seq.*, Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout New Jersey; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in New Jersey.

Accordingly, Plaintiff and Class members seek all forms of available relief under N.J. Stat. Ann. 56:8-1 *et seq*.

281. **New Mexico**: Defendants have engaged in unfair competition, unfair unconscionable acts or practices in violation of New Mexico Stat. §§ 57-12-1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout New Mexico; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful, unfair, and unconscionable conduct substantially impacted commerce in New Mexico. Accordingly, Plaintiff and Class members seek all forms of available relief under N.M. Stat. §§ 57-12-1, *et seq*.

282. **North Carolina**: Defendants have engaged in unfair competition, unfair, or unconscionable in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout North Carolina; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of

the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in North Carolina. Accordingly, Plaintiff and Class members seek all forms of available relief under this statute. N.C. Gen. Stat. §§ 75-1.1, et *seq***.**

283. **Rhode Island**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act. R.I. Gen. Laws §§ 6-13.1-1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Rhode Island; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Rhode Island. Accordingly, Plaintiff and Class members seek all forms of available relief under R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

284. **Vermont**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Vermont; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Vermont. Accordingly, Plaintiff and Class members seek all forms of available relief under 9 Vermont Stat. Ann. §§ 2451, *et seq*.

285. **West Virginia**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code §§ 46A-6-101, *et seq*. Defendants' conduct has had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout West Virginia; (2) Conventional Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members

of the Damages Class paid supra-competitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in West Virginia. Accordingly, Plaintiff and Class members seek all forms of available relief under W.Va. Code §§ 46A-6-101, *et seq*.

## COUNT 4: UNJUST ENRICHMENT

## (Against All Defendants)

236. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

237. Defendants have unlawfully benefitted from their sales of HVAC Equipment because of the unlawful and inequitable acts alleged in this Amended Complaint. Defendants unlawfully overcharged indirect reseller purchasers, who purchased HVAC Equipment at prices that were more than they would have been but for Defendants' unlawful actions.

238. Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and members of the Damages Class.

239. Plaintiff and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Damages Class.

240. Defendants have been enriched by revenue resulting from unlawful overcharges for HVAC Equipment while Plaintiff and members of the Damages Class have been impoverished by the overcharges they paid for HVAC Equipment

imposed through Defendants' unlawful conduct. Defendants' enrichment and the impoverishment of Plaintiff and members of the Damages Class are connected.

241. There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gain from their unlawful overcharges.

242. Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

243. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of HVAC Equipment.

244. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of HVAC Equipment are ascertainable by review of sales records.

245. It would be futile for Plaintiff and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Damages Class with respect to Defendants' sales of HVAC Equipment.

246. It would be futile for Plaintiff and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased HVAC Equipment, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiff and the Damages Class for Defendants' unlawful conduct.

247. The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for

HVAC Equipment is a direct and proximate result of Defendants' unlawful practices.

248. The financial benefits derived by Defendants rightfully belong to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

249. It would be inequitable under unjust enrichment principles under the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for HVAC Equipment derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Amended Complaint.

250. Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as HVAC Equipment prices remain inflated above pre-conspiracy levels.

251. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Damages Class all unlawful or inequitable proceeds they received from their sales of HVAC Equipment.

252. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect reseller purchases of HVAC Equipment by Plaintiff and the Damages Class.

## VIII. DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that this Court:

A. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and direct

that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the class, and declare the Plaintiff as representative of the Class;

B. Enter joint and several judgments against Defendants and in favor of the Plaintiff and members of the proposed classes;

C. Award to Plaintiff and the members of the proposed Damages Class damages (i.e., three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

D. Award to Plaintiff and the members of the proposed classes their costs of suit, including reasonable attorneys' fees, as provided by law;

E. That the Court enter an order declaring that Defendants' actions, as set forth in this Amended Complaint, violate the federal and state laws set forth above;

F. That the Court issue appropriate injunctive and other equitable relief against Defendants; and

G. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## IX. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 4, 2026 Respectfully submitted,

By: *\/s/ Gerard Mantese*________________

Gerard Mantese (#P34424)
Kathryn Regan Eisenstein (#P66371)
**MANTESE HONIGMAN, PC**
1361 E. Big Beaver Road

Troy, MI 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com
keisenstein@manteselaw.com

Joseph J. DePalma*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
jdepalma@litedepalma.com

Laura K. Mummert*
Steven J. Greenfogel*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Telephone: (267) 314-7980
lmummert@litedepalma.com
sgreenfogel@litedepalma.com

*Attorneys for Plaintiff and the Putative Class*

* Admission documents to be filed.